UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY M. HARRINGTON,

        Plaintiff,                      Civil Action No. 10-cv-12982

        v.                             District Judge Nancy G. Edmunds
                                            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 16]**

Plaintiff Mary M. Harrington brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 13, 16), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 12).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge applied the correct legal standards, and his decision is supported by substantial evidence. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff filed an application for disability on September 16, 2005, alleging that she became unable to work on July 28, 1998.[1] (Tr. 51.) The Commissioner initially denied Plaintiff's disability application on March 28, 2006. (Tr. 39-42.) Plaintiff then filed a request for a hearing, and on July 23, 2008, she appeared with counsel before Administrative Law Judge ("ALJ") Thomas L. Walters, who considered the case *de novo*. (Tr. 347-78.) In a January 29, 2008 decision, the ALJ found that Plaintiff was not disabled. (Tr. 9-21.) The ALJ's decision became the final decision of the Commissioner on June 4, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 306.) Plaintiff filed this suit on July 28, 2010.

### B. Background

Plaintiff was 37 years old at the time of the administrative hearing in this matter. (Tr. 363.) She was 27 years old on the alleged onset date. (Tr. 51.) She attended school through the eighth grade. (Tr. 363.) She has no past relevant work. (Tr. 364.) Plaintiff was in a motor vehicle accident in 1998. (Tr. 293.) Her back and neck injuries seem to stem from that accident. (*Id.*)

#### 1. *Plaintiff's Testimony*

At the July 23, 2008 hearing before the ALJ, Plaintiff stated that she cannot read or write very well. (Tr. 363.) She also testified that she is not married and lives at home with her three children. (*Id.*) Her only income is public assistance. (Tr. 364.)

With regard to her physical impairment – back pain – Plaintiff testified that it is difficult for

---

[1] The Plaintiff also filed previous applications for SSI payments on December 14, 2001, July 21, 2003 and October 14, 2004. (Tr. 12.)

her "to do a lot of things." (Tr. 365.) She stated that she has to take a lot of breaks. (Tr. 365.) She also testified that she frequently lays down during the day, and takes Vicodin ES, Flexeril and Soma to relieve pain. (Tr. 366, 375.) She claimed that she can only lift a "gallon of milk." (Tr. 367.) She also stated that she can only walk a half block before she has to stop. (*Id*.)

With regard to her mental impairment – depression – Plaintiff testified that she cries a lot and gets upset easily. (Tr. 367.) She also has problems sleeping despite getting about six hours of sleep a night. (Tr. 368-69.) She also testified that she has trouble with her appetite and nausea. (Tr. 369.) Her weight has ranged from 170 pounds to 250 pounds in the last three years. (*Id*.) She stated that she feels as if nothing "ever works out right." (Tr. 371.) She also testified that she does not feel comfortable around people so she stays in her room most of the time. (Tr. 372.) At the time of the hearing, she took Cymbalta and went to therapy twice a month for her depression. (Tr. 375-76.)

    *2. Medical Evidence*

      *a. Diagnostics*

Plaintiff received x-rays of her lumbar and thoracic spine on June 9, 2004. (Tr. 357.) These x-rays revealed a "[v]ery mild broad base . . . curvature of the thoracic spine," and "bilateral spondylolysis of L5 with slight anterior spondylolisthesis of L5 on S1." (Tr. 357.) Plaintiff's physician at the time, Dr. Iwanow, wanted to follow-up on these x-rays with a bone scan. (*Id*.)

Plaintiff received a "nuclear medicine whole body bone scan" on June 21, 2004. (Tr. 355.) This scan revealed that Plaintiff's "cervical thoracic, and lumbar spine" were normal without any evidence of arthritic changes. (*Id*.) The record does not indicate that Plaintiff sought much medical care for her back between June of 2004 and March of 2006.

### *b. Dr. Amarish S. Potnis*

Plaintiff began seeing Dr. Amarish S. Potnis of the MidMichigan Physicians Group regarding her back problems on March 8, 2006. Plaintiff told Dr. Potnis that her pain level was about a "7 out of 10" normally, but a "3 out of 10" with Vicodin. (Tr. 167.) Dr. Potnis advised Plaintiff to continue using Vicodin to alleviate pain and use Flexeril – a muscle relaxant – as needed. (Tr. 168.)

Plaintiff visited Dr. Potnis again on August 1, 2006, and again stated that Vicodin reduces her pain level from a "7 to a 3 out of 10." (Tr. 169.) Again, Dr. Potnis advised her to continue her Vicodin and Flexeril and follow-up in 3 months. (Tr. 169-70.) Dr. Potnis also noted "[s]ome mild depressive symptoms." (Tr. 169.) Dr. Potnis told her to resume Trazodone at night to aide her with sleeping, and if her mood continued to worsen to contact Community Mental Health. (*Id.*)

On November 7, 2006, Plaintiff told Dr. Potnis that her pain was "a little bit more irritating." (Tr. 171.) She indicated that her back pain was at a pain level of 7 or 8 out of 10, and her neck pain was at a 6 out of 10. (*Id.*) Vicodin reduced the pain to a 4 out of 10 for both. (*Id.*) She also told Dr. Potnis that she was depressed. (Tr. 171.) Dr. Potnis advised her to continue the Vicodin, and resume taking Zoloft. (*Id.*) He also recommended that she contact Community Mental Health. (Tr. 172.)

Plaintiff saw Dr. Potnis again on December 8, 2006. (Tr. 173.) She indicated that her pain was about the same. (*Id.*) However, her mood had improved on the Zoloft. (*Id.*) Dr. Potnis continued her on her medications and told her to follow-up in 3 months. (*Id.*)

Plaintiff saw Dr. Potnis again on March 20, 2007 and her pain and depression seemed to have stabilized and were about the same. (Tr. 175.) She told Dr. Potnis that she did not feel she

4

needed therapy. (*Id.*)

On June 19, 2007, Plaintiff told Dr. Potnis that her pain was essentially the same. (Tr. 173.) In addition, she told Dr. Potnis that her mood had been fine, and that she did not feel as though she needed any antidepressants. (*Id.*) Dr. Potnis refilled her Vicodin prescription. (*Id.*)

Plaintiff saw Dr. Potnis again on September 18, 2007. (Tr. 179.) She indicated that her back pain was at a 7-8 out of 10 normally, but a 2-3 out of 10 with Vicodin. (*Id.*) Her mood was "nondepressed." (*Id.*) Dr. Potnis continued the Vicodin and asked her to return in 3 months. (*Id.*)

On December 18, 2007, Plaintiff told Dr. Potnis that her "days [had] been good and manageable with the regimen but the nights [were] still problematic." (Tr. 181.) Dr. Potnis indicated that she had already tried multiple medications for sleeping. (*Id.*) He suggested resuming Trazodone at a different dosage level. (*Id.*)

Plaintiff saw Dr. Potnis again on March 18, 2008. (Tr. 183.) She indicated that her pain level was a 2 out of 10 on Vicodin. (*Id.*) She also indicated that she was sleeping better on Trazodone, but was irritable in the mornings. (*Id.*) Dr. Potnis continued her medications, but reduced her Trazodone dosage. (Tr. 183-84.)

Plaintiff's last appointment with Dr. Potnis in the record was on June 17, 2008. (Tr. 185.) Her pain level was about the same. (Tr. 185.) Dr. Potnis continued her medications. (*Id.*)

    *c. Community Mental Health*

Plaintiff began seeing Therapist Aileen Guerra, LLPC, MA, on July 26, 2007. (Tr. 125.) Guerra diagnosed her at intake with moderate depression and a Global Assessment Functioning

("GAF") score of 47.[2]

Plaintiff saw Guerra again on August 10, 2007. (Tr. 138.) Plaintiff indicated that she was unable to sleep due to anxiety. (Tr. 138.) Guerra "worked on techniques to help her alleviate her anxiety using [Cognitive Behavioral Therapy] methods." (*Id.*) Plaintiff continued to see Guerra on the following dates: August 20, 2007, August 29, 2007, September 10, 2007, October 2, 2007, October 31, 2007, January 1, 2008, and March 12, 2008. (Tr. 139-157.) On April 2, 2008, Plaintiff discussed her mother's recent death with Guerra. (Tr. 158.) Plaintiff indicated that besides grief, she was dealing with financial stressors from the funeral. (Tr. 158-60.)

Consulting Psychiatrist Razvan Adam assessed Plaintiff for Community Mental health on May 2, 2008. (Tr. 162-64.) Dr. Adam noted that Plaintiff's family history was "remarkable for a mother with possible Schizophrenia." (Tr. 163.) He also noted that Plaintiff's brother used Crack Cocaine and her sister used IV Heroine and Crack Cocaine." (*Id.*) Dr. Adam noted that Plaintiff had been on state assistance since 1998. (*Id.*) Plaintiff told Dr. Adam that her depression had significantly worsened since her mother's death. (*Id.*) Dr. Adam diagnosed Plaintiff with major depressive disorder, and a GAF of 35.[3] (Tr. 164.)

---

[2] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("*DSM-IV*") 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

[3] A GAF of 31-40 reflects "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *DSM-IV* at 32.

On May 16, 2008, Plaintiff saw Guerra again and indicated that she was "stress free" with regard to her mother. (Tr. 165.)

### d. *Disability Determination Service Consultations*

Dr. R. Scott Lazzara assessed Plaintiff's neck and back injuries via a consultative examination for the Disability Determination Service (DDS) on April 27, 2005. (Tr. 291.) He indicated that she was "sensitive to touch in the mid thoracic and lumbar spine area." (Tr. 293.) He also indicated that "[h]er long term prognosis" was "good assuming she does not have any further trauma." (Tr. 293.)

Larry Thompson of the state DDS completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 12, 2005. (Tr. 253-60.) He noted some exertional limitations including that Plaintiff could only occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 254.) He also indicated that Plaintiff could sit, stand and/or walk for 6 hours in an 8-hour workday. (*Id*.)

Psychologist George F. Ronan assessed Plaintiff's mental impairments for the state DDS on February 15, 2006. (Tr. 226-29.) In his report, he indicated that Plaintiff had poor hygiene and "was depressed throughout the evaluation." (Tr. 227-28.) He diagnosed her with major depressive disorder, recurrent, severe, without psychotic symptoms, and gave her a GAF of 55.[4] (Tr. 229.)

Dr. Kerstyn C. Zalesin assessed Plaintiff's back and neck pain, again, via a consultative examination for the state DDS on March 15, 2006. (Tr. 202-06.) Her report contained the following conclusion:

> On physical examination the patient had some mild limitations of range of motion about the left shoulder which can lead to difficulties with overhead and repetitive use in an employment situation. The

---

[4] A GAF of 55 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

8

> patient exhibited significant tenderness on physical examination which can be exacerbating her pain. Otherwise she exhibited no limitations with her functional capabilities and was able to perform maneuvers and had excellent strength testing on physical examination today.

(Tr. 206.)

Amanda Bruce of the state DDS completed a Physical Residual Functional Capacity Assessment of Plaintiff on March 28, 2006. (Tr. 194-201.) Bruce acknowledged Plaintiff's medical evidence regarding physical pain and limited range of motion in her shoulder, but also noted her activities of daily living:

> [Plaintiff] cares for herself and her school-aged children. She does light duty work around the house and as needed outdoors. She shops, handles her own money and makes all meals. She has no difficulty with personal care and grooming. She enjoys talking on the phone and spends her days caring for her children and the needs of her household.

(Tr. 199.)

To this end, Bruce stated that Plaintiff's statements regarding her pain and limitations "were partially credible." (Tr. 199.)

On March 23, 2006, Joseph F. DeLoach, Ph.D. completed a Psychiatric Review Technique form on behalf of the state DDS for Plaintiff. (Tr. 208-221.) DeLoach diagnosed Plaintiff with major depressive disorder, recurrent, severe. (Tr. 211.) However, he indicated that she only had mild limitations with respect to activities of daily living, and concentration. (Tr. 218.) In addition, while she had moderate limitations with regard to social functioning, she had no episodes of decompensation. (*Id*.)

DeLoach also completed a Mental Residual Functional Capacity Assessment form for Plaintiff. (Tr. 222-24.) In it, he indicated that Plaintiff was moderately limited in a number of areas. (Tr. 222-23.) His ultimate assessment, however, was that Plaintiff retained the "capacity to perform

simple tasks on a sustained basis." (Tr. 224.)

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Michelle A. Ross testified at the hearing. (Tr. 377.) The ALJ asked the VE questions based on the following hypothetical individual:

> Assume a person of the same age, education and vocational experience as the claimant; who would have a residual functional capacity for a range of sedentary, unskilled work that did not involve the need to read or write; that afforded a sit/stand option at least every 30 to 60 minutes; did not involve more than superficial or limited contact with the public and did not involve prolonged walking beyond 100 yards; and only occasional bending, twisting, turning, climbing, crawling, squatting or kneeling.

(Tr. 378.)

The VE testified that such an individual could perform sedentary, unskilled jobs. (*Id*.) These jobs included: bench assembler, sorter, and machine attendant. (Tr. 373.) The VE testified that there were 4,900, 5,000 and 4,000 of these jobs available in Michigan respectively. (Tr. 378-79.)

The VE also testified that the Plaintiff could not work if the ALJ fully credited Plaintiff's testimony regarding her impairments because of her "need to lay down a number of times during the day in order to relieve pain," and the difficulty she has "leaving her room or her home on any sustained basis." (Tr. 379.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any

> medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).


> medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of September 16, 2005. (Tr. 14.) At step two, the ALJ found that Plaintiff had the following severe impairments: low back pain and depression. (*Id*.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 17.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "sedentary work as defined in 20 C.F.R. § 416.967(a) with a sit/stand option every 30-60 minutes; no walking greater than 100 yards; occasional bending, twisting, turning, climbing, crawling, squatting, and kneeling, limited contact with the public, and no work which requires the need to read or write." (Tr. 18.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 20.) At step five, the ALJ stated that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id*.) Therefore, the ALJ held that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 21)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

*1. The ALJ Properly Applied the Treating Source Rule*

Under the treating source rule, an ALJ must generally give greater deference to the opinions of treating physicians and psychologists than to those of non-treating physicians and psychologists. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p. The rationale behind this rule is straightforward:

> treating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ committed "reversible legal error" with regard to the treating source rule "by failing to give great weight to the uncontested opinion's [sic] of Plaintiff's treating mental health professionals." (Dkt. 13, Pl.'s Mot. Summ. J. at 2.) Plaintiff further argues that if the ALJ had given these "treating mental health professionals" the proper weight, their findings "would mandate a finding of disability with a later onset date." (*Id*. at 1.) Plaintiff's summary judgment motion refers to two different dates as potential "later onset date[s]." (*Id*. at ECF 2 and 1.) In the statement of facts, Plaintiff indicates that she argued for a November 17, 2006 disability onset date to the Appeals Council. (*Id.* at 1.) But in the argument portion of her brief, , Plaintiff argues for an onset date of July 26, 2007 – the date Plaintiff began her treatment with Therapist Guerra at

Community Mental Health. (*Id*. at ECF 2, 9) ("Mary Harrington would aver that the ALJ failed in that duty to properly consider if plaintiff was disabled on or after July 26, 2007.") Since Plaintiff's brief primarily addresses the medical records of Ms. Guerra and Dr. Adam of Community Mental Health, this Court presumes that the July 26, 2007 date is the date for which Plaintiff is currently advocating.[5] (*Id*. at 3-4.)

The record reveals that the ALJ extensively reviewed the medical evidence from Ms. Guerra. (Tr. 16.) The ALJ noted that Ms. Guerra treated Plaintiff from July 26, 2007 through May 16, 2008, and recounted Guerra's "longitudinal picture" of Plaintiff's mental impairments. (Tr. 16.) The ALJ noted that Plaintiff reported to Guerra with a depressed mood on August 20, 2007. (*Id*.) Her depression worsened after her mother's death. (*Id*.) However, on May 16, 2008, the Plaintiff reported that she was "stress free." (*Id*.) Notably, Guerra never gave an opinion as to Plaintiff's functional limitations. (Tr. 125-60.) Guerra did, however, assign Plaintiff a GAF score of 47, which the ALJ acknowledged "is indicative of a serious impairment in social, occupation, or school functioning." (Tr. 16.) As Defendant points out, though, there is no "statutory, regulatory, or other

---

[5] With regard to the November 17, 2006 alleged onset date, Plaintiff seems to argue that the ALJ did not give Dr. Potnis's opinion controlling weight because if, in fact, the ALJ had given Dr. Potnis's opinion controlling weight he would have assigned an onset date for her depression of November 17, 2006. The Court does not know where Plaintiff gets this date, but notes that Plaintiff told Dr. Potnis that she was depressed on November 7, 2006. (Tr. 171.) This argument is unavailing. The record reveals that the ALJ extensively reviewed the medical evidence from Dr. Potnis from March 8, 2006 through June 17, 2008. (Tr. 15-16.) Indeed, the ALJ noted that Dr. Potnis prescribed Plaintiff Prozac on November 7, 2006 for her "complaints of depression." However, a patient's complaints regarding an impairment does not constitute a medical opinion. *Poe v. Comm'r Soc. Sec.*, 342 Fed. App'x 149, 156 (6th Cir. 2009). The record reveals that Dr. Potnis never gave an opinion regarding Plaintiff's mental functional capacity. Moreover, Plaintiff indicated to Dr. Potnis on several occasions that she was either not limited by depression or not depressed. (Tr. 173, 175.) Indeed, less than a year after November 17, 2006, Plaintiff, herself, was of the opinion that she was not depressed. (*Id*.)

authority requiring the ALJ to put stock in a GAF score." (Dkt. 15, Def.'s Mot. Summ. J. at 8.); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). As such, the ALJ properly reviewed and considered Guerra's medical records.

Plaintiff also seems to argue that the ALJ did not give proper weight to the opinion of Dr. Adam. The Court notes that Plaintiff saw Dr. Adam on only one occasion. (Tr.162-64.) Therefore, he does not qualify as a treating physician. *See Kornecky*, 167 F. App'x. at 506-07.

In addition, the ALJ's decision does, in fact, weigh Dr. Adam's opinion:

> [O]n May 2, 2008, the claimant reported to R. Adam, M.D., that she was grieving her recently deceased mother. She reported depressed mood, crying spells, and lack of motivation. Dr. Adam reported the claimant's insight and judgment were fair and the claimant reported her depression had worsened in the context of her mother dying two weeks ago. Dr. Adam's diagnoses include major depressive disorder, recurrent, most recent episode moderate and he assessed the claimant's current GAF as 35, which is indicative of a major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.

(Tr. 16.)

Notably, at the end of his review of all the medical documents, the ALJ writes: "[A]fter careful evaluation of the entire record, the undersigned finds that while the claimant has more severe functional limitations than those found by the DDS consultants, the conclusion that the claimant is not disabled, is substantially supported and largely consistent with the record as a whole." (Tr. 17.) This Court finds that the ALJ did, in fact, perform a careful review of all the medical evidence, and did not commit reversible error in his application of the treating source rule to that evidence.

### 2. *The ALJ's Decision is Supported by Substantial Evidence*

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the

16

question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Plaintiff argues that the ALJ's hypothetical did not accurately portray Plaintiff's mental impairments because the ALJ failed to give the proper weight to the Plaintiff's treating mental health professionals, "which clearly indicate[d] a worsening of her depression." (Dkt. 13, Pl.'s Mot. Summ. J. at 2.) The Commissioner responds that, taking into account the ALJ's assessment of Plaintiff's treating sources, substantial evidence supports the ALJ's RFC and hypothetical. (Dkt. 16, Def.'s Mot. Summ. J. at 5.)

This Court agrees with the Commissioner. The ALJ's assessment of Plaintiff's treating sources is discussed in detail above and supports the ALJ finding that Plaintiff had an RFC for a range of sedentary, unskilled work that did not involve more than superficial or limited contact with the public. With regard to the mental limitations in this RFC, the ALJ stated that the Plaintiff "was generally found to exhibit logical and coherent thought processes and proper orientation." (Tr. 19.) Moreover, the ALJ accounted for Plaintiff's social limitations by limiting her to only superficial or limited contact with the public. (Tr. 368.) Accordingly, substantial evidence supports the ALJ's determination that Plaintiff could work as a bench assembler, sorter, and machine attendant. Thus, the RFC and the ALJ's ultimate finding that Plaintiff was not disabled were appropriate.

### G. Conclusion

For the reasons set forth above, this Court finds that the Administrative Law Judge applied the correct legal standards, and his decision is supported by substantial evidence on the record. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

Date:   November 15, 2011                              s/Laurie J. Michelson
                                                       Laurie J. Michelson
                                                       United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 15, 2011.

                                                       s/Jane Johnson
                                                       Deputy Clerk